# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF COLORADO

In re:                         )

THIERRY L. INGHILTERRA and    )     Bankruptcy Case No. 11-11776 HRT
KIMBERLY INGHILTERRA        )

                            )     Chapter 7
Debtors.                   )

## ORDER ON MOTION TO DISMISS

THIS MATTER came before the Court on the United States Trustee's Motion to Dismiss Chapter 7 Case Under 11 U.S.C. § 707(b)(1), (2), and (3) (the "Motion" or "Motion to Dismiss," docket # 31), and the Debtors' Response thereto (docket #37). The Court held an evidentiary hearing on February 24, 2011, and took the matter under advisement. The Court is now prepared to rule, and hereby finds and concludes as follows.

## I.    BACKGROUND

### A.    Real Property

Debtors purchased as a residence a real property located at 750 Poplar Street, Denver, Colorado (the "Poplar Property") with a loan in 2004. (Stipulations of Fact, docket #57 [hereinafter "Stips."] ¶ 1.) Mr. Inghilterra testified that when the Debtors purchased the Poplar Property, they were not thinking of selling it for profit; they bought it because they needed a place to live.

In May 2006, Debtors refinanced the Poplar Property with a loan from NationPoint Bank in the principal amount of $202,500, secured by the Poplar Property. (Stips. ¶ 1.) Mr. Inghilterra testified credibly at trial that the purpose of refinancing was to get cash for Mrs. Inghilterra's business, Ella Bleu. He estimated that they received $20,000-25,000 cash from the refinancing. He further testified that they refinanced the original loan on the Poplar Property with the intention of continuing to live in the home. The Deed of Trust on the Poplar Property requires Debtors to use the Poplar Property as their principal residence for at least one year, but does not limit their ability to rent the property thereafter. (Ex. E at 7.)

In 2008, Mrs. Inghilterra became pregnant with twins, and the Debtors decided to move to a larger home that would better accommodate their growing family (Debtors already had a young son). In May 2008, they purchased a real property located at 6660 Eastman Avenue, Denver, Colorado ("Eastman Property"). They have lived there since.

When they purchased the Eastman Property, the Debtors tried, for a time, to sell the Poplar Property, but were unsuccessful. They were able to rent it, but had to rent it for less than the cost of their mortgage. They hoped that they would be able to sell the Poplar Property for a profit later.

The Debtors were never able to rent the property for a profit and, in August 2010, the Debtors lost their renter. They stopped making mortgage payments and, after filing for bankruptcy, they allowed the bank to foreclose on the Poplar Property. Mr. Inghilterra testified that the Debtors intended to surrender the property as part of the bankruptcy, and that they did not think they could do anything to prevent the loss of the property. Indeed, Debtors reaffirmed the debt on the Eastman Property, but did not reaffirm the debt on the Poplar Property. (U.S. Trustee's Ex. 1a.)

### B.   Mrs. Inghilterra's Business and Occupation

Mrs. Inghilterra started her business, a retail clothing boutique called "Ella Bleu," in the Lowry neighborhood, but moved to the Landmark development in Greenwood Village in 2007. Mrs. Inghilterra testified that the business was successful in Lowry, but floundered after the Landmark development declared bankruptcy. According to Mrs. Inghilterra, they never got the foot traffic that was promised because the high-rise buildings that were supposed to be constructed were not completed on time and because Greenwood Village did not allow the signage they had expected. The business never did very well, and they were not able to find a buyer. Consequently, Ella Bleu defaulted on its lease, and a new landlord repossessed the space – and everything in it – by locking Mrs. Inghilterra out. The business closed in September 2010, by which time Mrs. Inghilterra had learned that she was pregnant with the Debtors' fourth child.

Though Ella Bleu had income in 2010, most of it went to pay the company's debts, which greatly exceeded its revenues. Consequently, Mrs. Inghiterra did not receive income from the company.

Mrs. Inghilterra personally guaranteed a number of Ella Bleu's loans, and was a co-signor on its credit cards. A number of those debts are listed on Debtors' schedules.

Following the closing of Ella Bleu, Mrs. Inghilterra became a stay-at-home mother. She is the primary caregiver for the Debtors' four children: a son, age seven, twin three-year-old daughters, and a ten-month old. Mrs. Inghilterra is not currently employed outside the home, and she has no plans to seek paid employment in the near future.

The Debtors' seven-year-old son attends school full-time at Montessori School of Denver until 2:30 p.m each weekday.[1]   The twins attend the Montessori School of Denver's preschool/kindergarten program from 8:30-11:15 during the week. It is Debtors' intention that, starting in September, they

---

[1]   There was no testimony regarding the costs, if any, of the seven-year-old's attendance at Montessori School of Denver, nor is there any evidence in Debtors' schedules in this regard. The Court presumes, therefore, that attendance is free for the seven-year-old.

will attend the kindergarten program for a second year. The Debtors' infant does not attend any regular daycare program. Rather, the Inghilterras periodically hire babysitters to provide childcare. According to Mrs. Inghilterra, this is necessary because when she is watching all four children, it is not possible for her to do other household chores or the work necessary to maintain the home. Further, Mr. Inghilterra testified that if the Debtors could not occasionally hire babysitters, he would need to work less so that he could be home to help his wife look after their children. In 2010, the Debtors paid, on average, $541.58 per month for babysitters. They also paid $1,387.58 per month for the preschool program. Starting in 2011, they incurred an additional $846 per month fee for the twins to participate in the kindergarten component of the Montessori program. (Debtors' Ex. H.) Thus, Mr. Inghilterra testified, Debtors are currently spending a total of $2,167.99 per month for the preschool/kindergarten program.[2] According to Mr. Inghilterra, although the Debtors could send their twins to a Denver Public Schools program for free, they choose to have them attend the Montessori program because they did not think the DPS program was "up to par."

### C.   Mr. Inghilterra's Income, Benefits, and Paycheck Deductions

Mr. Inghilterra works as a salesman for Infiniti of Denver. He receives a base salary of $2,000 per month, plus commissions, bonuses, and incentives based on his sales. (Stips. ¶ 6.) Mr. Inghilterra sometimes also receives "spiffs" – a type of incentive pay or bonus – from the manufacturer of the vehicles he sells.

As part of his employment, Mr. Inghilterra is able to use, as commuter vehicles, vehicles that are owned by his employer.[3] To account for this benefit, Mr. Inghilterra receives "demo pay" in the amount of $346.16 per pay period,[4] or $750.01 per month.[5] Each pay period he also has a corresponding "demo deduct" in the amount of $374.20,[6] or $810.77 per month, which is deducted

---

[2]   The testimony was not clear as to what, if any effect, the twins' attending kindergarten for a second year, beginning in September, will have upon the Debtors' tuition costs, nor whether it will affect the amount of time they spend in school on a daily basis.

[3]   The vehicles remain part of the dealer's fleet, and are for sale, so, while Mr. Inghilterra can, and does, drive the demo vehicles for non-business purposes, such as taking his children to school, his use is restricted in that he cannot, for example, transport his dog in the demo vehicles or eat in the vehicle. He has to keep the car in good condition. If his employer sells the particular vehicle he is using, he gets a different one from the employer. The "demo pay" and "demo deduct" do not change with a change in vehicle.

[4]   This is consistent with Mr. Inghilterra's pay stub. (Debtors' Ex. L.)

[5]   The parties stipulated that Mr. Inghilterra is paid 26 times per year and, therefore, receives an average of $807.71/month in demo pay. However, $346.16 x 26/12 = $750.01.

[6]   This is also consistent with Mr. Inghilterra's pay stub. (Debtor's Ex. L.)

3

from his paycheck.[7] Mr. Inghilterra could not receive "demo pay" if he did not use his employer's vehicle and have the corresponding "demo deduct" expense. (Stips. ¶ 10.) "Demo pay" is reflected as income in Mr. Inghilterra's W-2.

In 2010, Mr. Inghilterra won Infiniti's annual "Cash Blast" competition. For this, he received a trip to Las Vegas, hotel, tickets to Cirque de Soleil, "welcome cash" of $500, $330 for the money he caught in a money booth, and an award of $6,000. This income, which totaled $7,944.60, was reflected in a 1099 issued by Nissan North America. (U.S. Trustee's Ex. 13 at 1.) In addition, Mr. Inghilterra received $127,911.35 in commission, spiffs, and bonus pay. He received $9,006.16 in "demo pay." He also received other income in the amount of $7,250 from Nissan that is reflected in a 1099. (U.S. Trustee's Ex. 13 at 4; Stips. ¶ 7.) Excluding the non-cash components of the Cash Blast award, Mr. Inghilterra had $150,491.51 in income in 2010. Further, Mr. Inghilterra contributed varying amounts to his 401(k), which amounts were deducted from his paychecks, for an average contribution of $879.94 per month. (Debtors' Ex. I.)

In 2011, Mr. Inghilterra earned $125,469.95 in the form of commission, spiffs, and bonus, and $9,000.16 in "demo pay." Further, the debtors received $1,255.00, as reflected in a 1099 issued by Maximum Talent, and $7,815.00, as reflected in a 1099 from Nissan. The parties have stipulated that the Debtors' total income in 2011 was $143,540.11.

### D.   Bankruptcy Filing and Amount and Type of Debt

Debtors filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code on January 31, 2011. On the same day, the Debtors filed a Statement of Intent in which they stated their intention to retain the Eastman Property. The Debtors did not indicate an intent to retain the Poplar Property.

Debtors list approximately $900,267.80 in debts in their bankruptcy schedules. Of that amount, Debtors identify $296,260.27 in business debt, not including their debt owed to NationPoint on the Poplar House. Initially, Debtors' creditors filed ten proofs of claim for business debt in the total amount of $205,391.78. Two creditors later withdrew their proofs of claim, leaving the total amount of business debt claimed at $174,964.03. (Stips. ¶ 5.)

Debtors contend that their debt is not primarily consumer debt. Therefore, they did not complete a Chapter 7 Statement of Current Monthly Income and Means-Test Calculation. However, Debtors did complete income and expense schedules, Schedules I and J, respectively.

U.S. Bank, N.A., filed a motion for relief from stay on the Poplar house on February 18, 2011. Debtors did not oppose the Motion, and it was granted on March 16, 2011.

The U.S. Trustee filed his Motion to Dismiss on August 8, 2011, arguing that (1) the majority

---

[7] The parties stipulated that Mr. Inghilterra receives an average of $873.13 per month in demo pay. However, $374.20 x 26/12 = $810.77 per month.

of Debtors' debt is consumer debt, and, therefore, the means test applies;[8] (2) the Debtors' income is substantially higher than the Debtors' schedules would indicate; and (3) Debtors' claimed childcare expenses are improperly claimed.

## II.   APPLICABLE LAW

Section 707 provides, in relevant part:

(b)(1) After notice and a hearing, the court . . . may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts, or, with the debtor's consent, convert such case to a case under chapter 11 or 13 of this title, if it finds that the granting of relief would be an abuse of the provisions of this chapter. . . .

(2)(A)(i) In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of—

(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $7,025, whichever is greater; or

(II) $11,725.

. . .

(3)  In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter in a case in which the presumption of abuse does not arise or is rebutted, the court shall consider –

(A) whether the debtor filed the petition in bad faith; or

(B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse.

11 U.S.C. § 707(b).

## III.   DISCUSSION

### A.   "Primarily Consumer Debts"

Debtors argue that section 707(b)(1) is not applicable to them because the majority of their debts are non-consumer debts.

---

[8]  The so-called "means test" is set forth in 11 U.S.C. § 707(b)(2).

5

Section 101(8) defines "consumer debt" as "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8).  According to the Tenth Circuit Bankruptcy Appellate Panel,

> Section 101(8) requires that the court consider the purpose for which the debt was incurred, and where the debt was incurred for more than one purpose, deems that the primary purpose of the debt will determine its nature  . . . Profit motive may be considered.

*Stewart v. U.S. Trustee (In re Stewart)*, 215 B.R. 456, 465 (10th Cir. BAP 1997).  *Cf. Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 913 (9th Cir. 1988)(finding that debt is not a consumer debt where it is obtained as part of business venture or for profit-seeking purposes).  The statutory threshold for finding that a debtor's debts are "primarily consumer debts" is passed "when 'the most part,' i.e., more than half, of the dollar amount owed is consumer debt."  *Id.* at 466.

It is undisputed that of the approximately $900,267.80 in debts listed in Debtors' bankruptcy schedules, more than $296,260.27 of that listed amount is non-consumer debt.  Debtors assert that their $195,000 debt to NationPoint for the Poplar Property is also non-consumer debt, because it was incurred for a business purpose, *i.e.*, to obtain cash for Ella Bleu.

In this case, Mr. Inghilterra testified, forthrightly, that the Debtors refinanced the mortgage on the Poplar Property for two purposes:  first, to obtain the $20,000 to $25,000 in cash they needed to fund Ella Bleu, and second to refinance the original mortgage on the Poplar Property.  At the time they took out the $202,500 loan, Mr. Inghilterra testified, they intended to continue to use the Poplar Property as their residence.  Thus, though $20,000 to $25,000 of the loan was incurred for a business purpose, the vast majority of the $202,500 debt – at least $177,500 – was incurred for a family or household purpose.  *See Stewart*, 175 F.3d at 807 (finding that appreciable portion of debtor's student loans were incurred for personal, family, and household expenses and, therefore, was consumer debt).  *Cf. Zolg v. Kelly (In re Kelly)*, 841 F.2d 908, 913 (9th Cir. 1988)(finding that debt is not a consumer debt where it is *obtained* as a business venture or for profit-seeking purposes).

The analysis is not changed by the fact that, two years after refinancing the Poplar Property, the Debtors chose to rent it in the hope that the housing market would recover and they would be able to sell the property at a higher price.  The language of section 101(8) plainly directs a Court to evaluate the purpose of the debt at the time it is *incurred*.  *See In re Victoria*, Case No. 10-42087-HHR-13, 2011 WL 2580106, *2 n.9 (Bankr. N.D. Ala. Jun. 22, 2011) (noting that 2010 note signed by debtor and her husband modifying terms of repayment of mortgage indicates that purpose of loan is personal); *In re Lemma*, 393 B.R. 299, 303 (Bankr. E.D.N.Y. 2008) (finding debt was "consumer debt" where there was no evidence that debtors were motivated by profit in incurring the debt and that the debt was incurred by debtors and their co-obligor for the purpose of residing in it); *In re Bertolami*, 235 B.R. 493, 496-97 (Bankr. S.D. Fla. 1999)(finding debt was consumer debt where debtors executed note and mortgage with purpose of making property their homestead; debtors' changed intentions and later use of property for business or investment purposes did not change analysis).  The Debtors' profit-seeking

motivation, which did not arise until well after the debt was incurred, is not relevant to the analysis.

Adding $25,000 to the undisputed $296,260.27 of non-consumer debt, the court concludes that, at most, $321,260.27 – less than half of the $900,267.80 total debt figure – is non-consumer debt. Because more than fifty percent of the Debtors' debts are "primarily consumer debts," the Court is required to determine whether the presumption of abuse arises under 11 U.S.C. § 707(b)(2).

### B.   "Presumption of Abuse"

Under section 707(b)(2), the Court is to presume abuse exists if the Debtors' current monthly income – reduced by the amounts set forth under clause (ii)(which relates to household expenses in the amounts specified under the National and Local Standards issued by the Internal Revenue Service, clause (iii) (which relates to amounts payable on secured debts), and clause (iv) (which relates amounts payable on Debtors' priority claims), and multiplied by 60 – is not less than 25 percent of the Debtors' nonpriority unsecured claims or $7,025, whichever is greater, or $11,725.

#### 1.   *Debtors' Current Monthly Income*

The first step in the analysis is to determine Debtors' current monthly income ("CMI"). "Current monthly income" is defined in 11 U.S.C. § 101(10A) to mean:

> (A) . . . the average monthly income from all sources that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on—
> (i) the last day of the calendar month immediately preceding the date of the commencement of the case if the debtor files the schedule of current income required by section 521(a)(1)(B)(ii); or
> (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section 521(a)(1)(B)(ii); and
> (B) includes any amount paid by any entity other than the debtor (or in a joint case the debtor and the debtor's spouse), on a regular basis for the household expenses of the debtor or the debtor's dependents (and in a joint case the debtor's spouse if not otherwise a dependent) . . .

11 U.S.C. § 101(10A).

In this case, the Debtors filed their Schedule I on January 31, 2011, as required by section 521(a)(1)(B)(b)(ii).[9] Thus, the Court's task is to determine the amount of Debtors' "average monthly income . . . derived during the 6-month period ending on . . . the last day of the calendar month

---

[9] The U.S. Trustee's Exhibit 15 is an analysis that takes into account an amended Schedule I. The Debtors did not file an amended Schedule I in this case, however.

immediately preceding the date of the commencement of the case" – that is, Debtors' average monthly income derived in the last six months of 2010.[10]

In the CMI calculation proffered by Debtors (Debtors' Ex. F), Debtors provide a calculation that shows that, during the relevant six month period, Mr. Inghilterra received $74,729.22 in income, not including $4,846.24 in demo pay, or $12,454.87 in gross monthly income.[11] Debtors contend that it is proper to exclude demo pay because the Debtors' ability to use a demo car is really more akin to a taxable fringe benefit than income because the only way that Mr. Inghilterra can access this benefit is to pay for the privilege of driving a demo vehicle. Specifically, because Mr. Inghilterra cannot receive demo pay unless he pays the demo deduct, he really receives no income and, in fact, pays for the benefit when his demo pay is netted against the demo deduct expense.[12]

The U.S. Trustee disagrees with Debtors' exclusion of demo pay from their CMI calculation, arguing that the demo pay *is* income received by Mr. Inghilterra, and the fact that he has to make a subsequent expenditure as a condition of receiving it is irrelevant.

At issue, then, is whether the definition of "current monthly income" set forth in section 101(10A) encompasses Mr. Inghiterra's demo pay. The task of resolving a dispute as to the meaning of a statute begins with the language of the statute itself. *U.S. v. Ron Pair Enters.*, 489 U.S. 235, 241 (1989). Where the language of the statute is plain, "'the sole function of the courts is to enforce it according to its terms.'" *Id.* (quoting *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917)).

Section 101(10A) defines "current monthly income" as "income from all sources that the debtor receives . . . without regard to whether such income is taxable income." The language of the statute is plain and broad. "'Income,' is 'a gain or recurrent benefit usually measured in money that derives from capital or labor.'" *In re DeThample*, 390 B.R. 716, 720 (Bankr. D. Kan. 2008)(citations omitted). The demo pay received by Mr. Inghilterra is unquestionably "income" under this definition.

A court's inquiry continues beyond the language of the statute only in those cases where (1) a literal application of the statutory language would be at odds with the manifest intent of the legislature; (2) a literal application of the statutory language would produce an absurd result; or (3) the statute is ambiguous. *Ron Pair*, 489 U.S. at 241. Here, Debtors suggest that a literal application would produce

---

[10] Both parties agree that the relevant period for evaluating CMI is July through December 2010. (*See* U.S. Trustee's Ex. 11; Debtors' Ex. F.)

[11] Debtors also exclude from that amount $692.32 that was mistakenly categorized by a new payroll company as "fringe" pay rather than "demo pay."

[12] At trial, both parties indicated that the amount that Mr. Inghilterra was required to pay out of pocket for use of a demo vehicle was about $68 per month, based on their stipulations that Mr. Inghilterra receives $807.71 per month in "demo pay" and has a "demo deduct" in the amount of $873.13 per month. However, as discussed in footnotes 3 and 5, monthly "demo pay" is $750.01 per month, while monthly "demo deduct is $810.77. Thus, Mr. Inghilterra's out-of-pocket cost for use of a demo vehicle is actually about $60 per month.

8

an absurd result. That is – if Mr. Inghilterra's "demo pay" is treated as income and "demo deduct" treated as an expense (rather than netting the two against each other and treating as an expense the difference paid each month for the benefit of driving a demo vehicle), Debtors will be penalized for their receipt of a benefit that, by definition, cannot benefit the estate. In other words, since Mr. Inghilterra cannot receive demo pay unless he uses it to pay for a demo car, those funds would never be able to benefit the estate and should not, therefore, be treated as income that can be used to pay creditors for purposes of the means test analysis. *See* 11 U.S.C. § 707(b)(2)(A)(ii)(I).

There is nothing absurd, however, about allowing demo pay to be treated as income for purposes of determining Debtors' eligibility to file under Chapter 7. "Congress designed the means test to measure debtors' disposable income and, in that way, 'to ensure that [they] repay creditors the maximum they can afford.'" *Ransom v. FIA Card Servs. N.A.*, 131 S.Ct. 716, 725 (2011)(quoting H.R.Rep. No. 109–31, pt. 1, p.2 (2005)). "This purpose is best achieved by interpreting the means test, consistent with the statutory text, to reflect a debtor's ability to afford repayment." *Id.* That requires a separate analysis of the income and expense amounts in each case. Related income and expenses cannot be netted to collapse that analysis. As above-median debtors, the Debtors are limited to the expense amounts set forth in the Local and National Standards as provided in 11 U.S.C. § 707(b)(2)(A)(ii)(I). These Debtors, like all Debtors, have to make choices about how to expend the dollars allowed under the Local and National Standards.

Debtors here have chosen to accept the benefit of use of a "demo vehicle." In so doing, they have also chosen to accept the consequence of incurring an expense that exceeds the National Standard for transportation ownership costs. Debtors in Chapter 7 are, by definition, of limited means and without ability to repay their creditors. As Congress apparently intended, if a debtor can afford more than the standard expenses, it most likely suggests that the debtor does, in fact, have the ability to repay creditors to some extent and should not be proceeding in Chapter 7.

With "demo pay" of $4,846.24 added to the $74,729.22 in pay received by Mr. Inghilterra during the six-month CMI period, the Debtors' CMI is $13,262.57.

### 2.    *Monthly Expenses*

The next step in the analysis is to determine the amount of Debtors' monthly expenses, as determined under clauses (ii), (iii), and (iv) of section 707(b)(2)(A).

Clause (ii) directs the Court to determine the amount of the Debtors' monthly expenses by reference to the National Standards and Local Standards issued by the Internal Revenue Service for the area in which the Debtors reside. *See* 11 U.S.C. § 707(b)(2)(A)(ii)(I).

The parties seem to agree on the amount of the vast majority of expenses that are included in the means test calculation. (*Compare* Debtors' Ex. K *with* U.S. Trustee's Ex. 14.) However, the U.S. Trustee disputes that the amounts owed monthly on the Poplar Property are properly claimed as a "deduction for debt payment" in the analysis because Debtors knew, at the time of filing, that they

9

would be surrendering the property and would not be paying this expense as an ongoing matter.

"Commonly referred to as the means test, § 707 is also known as the 'presumption of abuse test' in Chapter 7 cases. In Chapter 7, § 707(b)(2) measures the debtor's financial condition at the time of filing and presumptively determines whether the debtor qualifies for Chapter 7 relief." *In re Blumer*, 453 B.R. 429, 430 (Bankr. D. Kan. 2011). In this analysis, the means test utilizes a debtor's income, along with a "'rigid and inflexible' set of expense standards," to provide a "snapshot"of a debtor's actual income and expenses as of the petition date. *Lindstrom*, 381 B.R. at 308. Excluding the payment on the Poplar Property would undercut the Court's ability to view an accurate "snapshot" of the Debtors' expenses at the time of petition. Accordingly, the Court agrees with the majority of courts that have considered the issue and holds that a debtor need not intend to retain the collateral securing a debt in order to claim the means test deduction for payments contractually owed on the debt. *See, e.g., In re Kogler*, 368 B.R. 785 (Bankr. D. Wis. 2007); *In re Lindstrom*, 381 B.R. 303 (Bankr. D. Colo. 2007); *In re Hoss*, 392 B.R. 463, 466 n.11 (Bankr. D. Kan. 2008). The monthly payment on the Poplar Property, therefore, is properly included in the means test calculation.[13]

The Court has done its own form B22A means test analysis in which it utilizes its income figure, along with Debtors' figures (including the payment on the Poplar Property) for their expenses as of the petition date. This analysis is set forth in Exhibit A to this Order. Therein, the Court concludes that the Debtors' monthly disposable income under 11 U.S.C. § 707(b)(2)(A) is $687.08, and that their 60-month disposable income is $41,224.80. As the 60-month disposable income exceeds $11,725 threshold set forth in section 707(b)(2)(A)(i), the court is required to find that the presumption of abuse under section 707(b)(1) exists.[14]

## C.   "Special Circumstances"

Section 707(b)(2)(B) provides:

(i) In any proceeding brought under this subsection, the presumption of abuse may only be rebutted by demonstrating special circumstances, such as a serious medical condition or a call or order to active duty in the Armed Forces, to the extent such special circumstances . . . justify additional expenses or adjustments of current monthly income for which there is no reasonable alternative.

(ii) In order to establish special circumstances, the debtor shall be required to itemize each additional expense or adjustment of income and to provide—

---

[13] This is not to say that in a reorganization B22 analysis, this expense would be allowed by the forward-looking approach taken in *Ransom*, 131 S.Ct. 716, and *Hamilton v. Lanning*, 130 S.Ct. 2464 (2010).

[14] In light of its conclusions regarding the Debtors' monthly income, the Court need not address other line items in the form B22A.

10

(I) documentation for such expense or adjustment to income; and

(II) a detailed explanation of the special circumstances that make such expenses or adjustment to income necessary and reasonable.

(iii) The debtor shall attest under oath to the accuracy of any information provided to demonstrate that additional expenses or adjustments to income are required.

(iv) The presumption of abuse may only be rebutted if the additional expenses or adjustments to income referred to in clause (i) cause the product of the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv) of subparagraph (A) when multiplied by 60 to be less than the lesser of—

(I) 25 percent of the debtor's nonpriority unsecured claims, or $7,025, whichever is greater; or

(II) $11,725.

11 U.S.C. § 707(b)(2)(A).

On the petition date, Debtors' household size was five. Thus, the parties' and the Court's presumption of abuse analyses reflect expenses for a household of five. Mrs. Inghilterra's pre-petition pregnancy, however, is a "special circumstance" that must be considered in determining the existence of abuse under section 707(b)(1). Specifically, because there is no reasonable alternative to incurring expenses for Debtors' fourth child, who must be clothed, fed, diapered, and cared for, it is appropriate to adjust Debtors' expenses to reflect those of a six-person household. *See In re Martin*, 371 B.R. 347, 355 (Bankr. C.D. Ill. 2007)(holding that pregnancy at time of filing is special circumstance because there is no reasonable alternative to incurring expenses claimed for increase in household size). In this case, that means that Debtors' monthly expense for food, apparel, and so forth at line 19 of the Form B22A should be adjusted to $1,895 per month per the IRS Standard, their expense for health care at line 19B should be adjusted to $360 per month per the IRS Standard, and their expense for taxes at line 25 should be adjusted to $2,181.56. (*See* U.S. Trustee's Ex. 14.)

In his section 707(b) analysis using six-person household figures, the U.S. Trustee adjusts the Debtors' childcare expense from $1,387.58 per month to $1,826.50. Though not stated at the hearing, it appears that the U.S. Trustee based the increase on the amounts claimed as expenses in Debtors' Schedule J (Debtors' Ex. S); however, Debtors offered no testimony as to the basis for this claimed expense nor documentation of the component expenses.[15] Further, Debtors offered no testimony as to

---

[15] The Court infers from the testimony and Debtors' Exhibit H that the Debtors are now paying $780.41 for the preschool program for the twins, $846.00 per month for the kindergarten program, and $200.89 for occasional babysitting, having reduced their babysitting costs on account of the twins' participation in the kindergarten program.

why the adjustment in expense is necessary and reasonable.[16] Thus, Debtors have not met their burden of establishing that the increase in "childcare costs" is a "special circumstance" under section 707(b)(2)(B).[17] Accordingly, no adjustment in childcare costs should be made for purposes of evaluating CMI.

Taking into consideration the adjustments discussed above, the Court concludes that the Debtors' monthly disposable income under 11 U.S.C. § 707(b)(2)(B)(iv) is $454.36, and that their 60-month disposable income is $27,261.60. Therefore, Debtors have failed to rebut the presumption of abuse.

### D.     Bad Faith/Totality of the Circumstances

Under section 707(b)(3), in considering under section 707(b)(1) whether the granting or relief would be an abuse of chapter 7 in a case in which the presumption of abuse does not arise, the Court is required to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse."

In this case, having found that the presumption of abuse arises and has not been rebutted, the Court need not go further in its analysis.

## IV.     CONCLUSION AND ORDER

For the reasons discussed above, the Court finds (1) that the Debtors' debts are primarily consumer debts and (2) that allowing the Debtors to remain in Chapter 7 would be an abuse. Accordingly, it is

ORDERED that the United States Trustee's Motion to Dismiss Chapter 7 Case Under 11 U.S.C. § 707(b)(1), (2), and (3) is GRANTED to the extent that it seeks dismissal under 11 U.S.C. § 707(b)(1) and (2). It is

FURTHER ORDERED that the United States Trustee's Motion to Dismiss Chapter 7 Case

---

[16] Though Mr. Inghilterra testified that the Debtors felt that the Denver Public Schools program that the twins might attend is not "up to par," this conclusory testimony is not the "detailed explanation of the special circumstances that make such expense[] . . . necessary and reasonable" that is required to establish that an adjustment in expenses is warranted. 11 U.S.C. § 707(b)(2)(II).

[17] The Debtors argued at trial that Mr. Inghilterra has had to increase his work hours in order to earn the level of income he now receives. The Debtors also argued that, absent their ability to hire babysitters and expend money for their kindergarten/preschool program, Mr. Inghilterra would have to cut back on his hours in order to help Mrs. Inghilterra more with the children. However, even if some level of daycare or educational expense were merited in order to provide Mrs. Inghilterra with the time she needs to care for the parties' home, the Debtors have failed to show that the cost of the Montessori program is necessary and reasonable when, as Mr. Inghilterra conceded, the twins could receive free schooling through a Denver Public Schools program.

Under 11 U.S.C. § 707(b)(1), (2), and (3) is DENIED AS MOOT to the extent that it seeks dismissal under 11 U.S.C. § 707(b)(3).  It is

FURTHER ORDERED that the Debtors' case will be dismissed unless they convert the case to another chapter by April 20, 2012.

Dated this 4th day of April, 2012.

BY THE COURT:

Howard R. Tallman, Judge
United States Bankruptcy Court

13

| | Inghilterra 707(b) Analysis | | |
|---|---|---|---|
| | | | Household of 6 |
| | Part II: Calculation of Monthly Income for § 707(b)(7) Exclusion | Household of 5 | (per UST) |
| 3 | Gross wages, salary, tips, bonuses, overtime, commissions | $13,262.00 | $13,262.00 |
| 4 | Income from the operation of a business, profession, or farm | | |
| 5 | Rent and other real property income | | |
| 6 | Interest, dividends, and royalties | | |
| 7 | Pension and retirement income | | |
| 8 | Any amounts paid by another rperson or entity, on a regular basis for the household expenses of the debtor or the debtor's dependents, including child support paid for that purpose | | |
| 9 | Unemployment Compensation | | |
| 10 | Income from all other sources | | |
| 11 | Subtotal of Current Monthly Income for § 707(b)(7) | $13,262.00 | $13,262.00 |
| 12 | Total of Current Monthly Income for  § 707(b)(7) (Debtor plus Spouse) | $13,262.00 | $13,262.00 |
| | | | |
| | Part III: Application of § 707(b)(7) Exclusion | | |
| 13 | Annualized current monthly income | $159,144.00 | $159,144.00 |
| 14 | Applicable median family income (family of five) | $90,121.00 | $90,121.00 |
| 15 | Application of § 707(b)(7) | | |
| | | | |
| | Part IV:  Calculation of Current Income for  § 707(b)(2) | | |
| 16 | Enter the amount from line 12 | $13,262.00 | $13,262.00 |
| 17 | Marital adjustment (none) | | |
| 18 | Current monthly income for § 707(b)(2) | $13,262.00 | $13,262.00 |
| | | | |
| | Part V:  Calculation of Deductions from Income | | |
| | Subpart A:  Deductions under Standards of the IRS | | |
| 19A | National standards: food, apparel, services, housekeeping, etc. | $1,633.00 | $1,895.00 |
| 19B | National standards: health care | $300.00 | $360.00 |
| 20A | Local standards: housing and utilities; non-mortgage expense | $473.00 | $473.00 |
| 20B | Local standards: housing and utilities; mortgage expense | $0.00 | $0.00 |
| | a. IRS Housing and Utilities Standards; mortgage/rental expense  ($1,322.00) | | |
| | b. Average Monthly Payment for any debts secured by home ($2,531.00) | | |
| | c. Net mortgage/rental expense (not less than 0) ($0.00) | | |
| 21 | Local standards:  housing and utilities; adjustment | | |
| 22A | Local standards; vehicle operations/public transportation | $472.00 | $472.00 |
| 22B | Local standards: transportation; additional public transportation expense | | |
| 23 | Local standards:  transportation ownership/lease expense; Vehicle 1 | $14.34 | $14.34 |
| | a. IRS Transportation Standards, Ownership Costs  ($496.00) | | |
| | b. Average Monthly Payment for any debts secured by Vehicle 1 ($481.66) | | |
| | c. Net ownership/lease expense for vehicle 1 ($14.34) | | |
| 24 | Local standards: transportation ownership/lease expense; Vehicle 2 | $496.00 | $496.00 |
| | a. IRS Transportation Standards, Ownership Costs  ($496.00) | | |
| | b. Average Monthly Payment for any debts secured by Vehicle 2 ($0.00) | | |
| | c. Net ownership/lease expense for vehicle 2 ($496.00) | | |
| 25 | Other Necessary Expenses: taxes | $2,270.84 | $2,181.56 |
| 26 | Other Necessary Expenses:  involuntary deductions for employment | | |
| 27 | Other Necessary Expenses:  life insurance | | |
| 28 | Other Necessary Expenses: court-ordered payments | | |
| 29 | Other Necessary Expenses:  education for employment or for a physically or mentally challenged child | | |

Exhibit A

| | | | |
|---|---|---|---|
| 30 | Other Necessary Expenses: child care (including baby-sitting, day care, nursery and preschool) | $1,387.58 | $1,387.58 |
| 31 | Other Necessary Expenses: health care (not including health insurance or health savings accounts) | | |
| 32 | Other Necessary Expenses: telecommunication services | | |
| 33 | Total Expenses under IRS standards (lines 19-30) | $7,046.76 | $7,279.48 |
| | *Subpart B: Additional Living Expense Deductions* | | |
| 34 | Health Insurance, Disability Insurance, and Health Savings Account Expenses | $958.45 | $958.45 |
| 35 | Continued contribution to the care of household or family members | | |
| 36 | Protection against family violence | | |
| 37 | Home energy costs | | |
| 38 | Education expenses for dependent children less than 18 (limited to $147.92 per child) | | |
| 39 | Additional food and clothing expense | | |
| 40 | Continued charitable contributions | | |
| 41 | Total Additional Expense Deductions under § 707(b) | $958.45 | $958.45 |
| | *Subpart C: Deductions for Debt Payment* | | |
| 42 | Future payments on secured claims | $4,569.71 | $3,012.66 |
| | a. Select Portfolio Servicing, Inc. ($1,557.05) (Poplar Property) | | |
| | b. Bank of the West ($2,531.00) (Eastman Property) | | |
| | c. Bank of America ($481.66) (Mrs. Inghilterra's Car) | | |
| 43 | Other payments on secured claims | | |
| 44 | Payments on prepetition priority claims | | |
| 45 | Chapter 13 administrative expenses (if eligible) | | |
| 46 | Total Deductions for Debt Payment (lines 42-45) | $4,569.71 | $4,569.71 |
| | *Subpart D: Total Deductions from Income* | | |
| 47 | Total of all deductions allowed under § 707(b)(2). (Total of lines 33, 41, and 46.) | $12,574.92 | $12,807.64 |
| | **Part VI: Determination of § 707(b)(2) Presumption** | | |
| 48 | Enter the amount from Line 18. (Current monthly income for § 707(b)(2)) | $13,262.00 | $13,262.00 |
| 49 | Enter the amount from line 47. (Total of all deductions allowed under § 707(b)(2)) | $12,574.92 | $12,807.64 |
| 50 | Monthly disposable income under § 707(b)(2). Subtract line 49 from line 48. | $687.08 | $454.36 |
| 51 | 60-month disposable income under § 707(b)(2) | $41,224.80 | $27,261.60 |
| 52 | Initial presumption determination | Amount in line 51 is more than $11,725; presumption of abuse arises. | Amount in line 51 is more than $11,725; presumption of abuse arises. |